Filed 4/22/14  In re L.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re L.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059789 |
| Plaintiff and Respondent, | (Super.Ct.No. J240341) |
| v. | OPINION |
| E.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Jasmine J. Turner-Bond, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

E.P. (father) appeals from the termination of his parental rights as to L.P. (born in March 2004) under Welfare and Institutions Code[1] section 366.26.[2]  Father contends the trial court erred in failing to apply the beneficial parental relationship exception to adoption.  We find substantial evidence supports the juvenile court's ruling, and we affirm.

## II.  FACTS AND PROCEDURAL BACKGROUND

San Bernardino County Children and Family Services (CFS) filed a juvenile dependency petition in August 2011, alleging that L.P. came within section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).  At the time of the petition, mother and father had been arrested on child endangerment charges.  The petition alleged that mother and father had substance abuse problems—mother overused "prescription medication," while father overused "sleeping aids."  The petition further alleged that mother and father had failed to protect L.P. by leaving rifles and ammunition unlocked and accessible to L.P. in the home.  The petition also alleged that father had engaged in domestic violence in the presence of L.P., and that mother had failed to protect L.P. from exposure to domestic violence.

---

[1]  All further statutory references are to the Welfare and Institutions Code.

[2]  The notice of appeal indicates that father also appeals from the juvenile court's denial of his section 388 petition, which was heard by the juvenile court on the same date as the section 366.26 hearing.  In his briefing on appeal, however, father has articulated no claim of error with respect to the juvenile court's denial of his section 388 petition, instead exclusively focusing on the termination of his parental rights and the juvenile court's determination with respect to the beneficial parental relationship exception.

The detention report stated that L.P. had called his maternal grandmother, C.H., because mother was on the floor and could not get up, father was sleeping all day in his room, and L.P. had not eaten anything except a stale cinnamon roll since returning to his parents from a visit at C.H.'s home the day before.  L.P. asked C.H. if he could "come back with her to stay."  C.H. called the police, who responded and found mother under the influence of an unknown drug, and father drunk or under the influence of an unknown drug.  When asked whether there were any weapons in the home, father responded "No," but L.P. showed police where there were three rifles and a box of shells in a place accessible to L.P.  Both parents were arrested on suspicion of child endangerment.  After being taken into temporary custody of CFS due to exigent circumstances, L.P. was placed in the care of C.H.

At the detention hearing on August 22, 2011, the court found a prima facie case had been established for detention, and found that C.H. was an appropriate temporary caregiver for L.P.

CFS filed a jurisdiction/disposition report in September 2011.  The report stated that L.P. was doing well in the home of C.H., and that he had not asked to go home to his parents.  The report acknowledged that mother and father appeared to love their son and want to care for him, and that father was able to provide for the family financially.  The report also expressed concerns, however, about the parents' level of functioning and perception of their needs.  Neither mother nor father believed or was willing to acknowledge the problems in the home observed by CFS that led to the dependency.

3

At the jurisdiction/disposition hearing in October 2011, the juvenile court dismissed the allegations regarding no provision for support (section 300, subd. (g)) at the request of CFS, but found the allegations of failure to protect (section 300, subd. (b)) true as alleged.  The court removed L.P. from the custody of his parents, placed him with C.H., and ordered reunification services, including weekly supervised visitation, for both parents.

The CFS six-month status review report filed in April 2012 recommended family reunification services to both parents continue, and L.P. to remain placed with C.H.  The report noted that mother had "been motivated and complied with almost all of the components of her case plan," but  father had "not been able to follow through with all the components of his case plan."  The report elaborated that father found it "challenging to comply" with his case plan due to his work schedule.  Moreover, father continued to deny that he needed substance abuse treatment, justifying his positive drug tests as the result of medicine he was taking under doctor's supervision, and his "no-show" testing results as a product of his work schedule.  Father had been terminated from a counseling program for attending a session while severely impaired and apparently under the influence of drugs or alcohol; the therapist recommended that father seek inpatient or a higher level of care.  But the social worker noted that mother's and father's visits with L.P., supervised by C.H., had been "consistent and appropriate" and concluded that "moderate" progress had been made "toward alleviating or mitigating the causes necessitating placement."  The social worker further reported that L.P. was adjusting well

4

to living in the home of C.H.  At the six-month review hearing, the court ordered that C.H.'s care of L.P. continue, and that parents receive continued reunification services.

The CFS 12-month status report filed in October 2012 recommended that family reunification services be terminated, and that a plan for permanent placement of L.P. be ordered—specifically, adoption by his current caregiver, C.H.  The report found the prognosis for returning L.P. to his parents to be "guarded," in that both parents continued to struggle with substance abuse issues, with mother entering treatment, but relapsing twice, while father had not engaged in substance abuse treatment.  The report found that L.P. "appear[ed] to be doing great" in C.H.'s home.  Parental visitation had been consistent and appropriate, but the social worker expressed concern that father "needs to interact and engage more with the child," because L.P. had reported that during their visits father "plays with [L.P.] for a few minutes and then goes inside the home and watches TV."

At the 12-month hearing on October 11, 2012, both parents were present and contested the CFS report, asking the court to set the matter for long cause.  The court ordered both parents to drug test that day, further ordered parents to provide written reports from any of their service providers they intended to have testify, and continued the matter.

On November 8, 2012, the CFS filed additional information to the court, advising that it was changing its recommendation, and now supported continued reunification services for mother and father, while L.P. remained in the care of C.H.  At a hearing on the same date, CFS and the parents informed the court that they had reached an

agreement, whereby CFS would recommend continued services, and parents would agree to work directly with the social worker, rather than through an intermediary, and would provide releases and any other appropriate documents to effectuate the case plan.. The court ordered continued reunification services for both parents, and on the recommendation of the social worker, authorized unsupervised visitation for mother.

The CFS 18-month status report, filed on February 5, 2013, recommended that services be terminated for both parents, and a section 366.26 hearing be set to establish a permanent plan of adoption. L.P continued to do very well in the home of C.H. The social worker reported that mother had complied with her case plan, but CFS could not return L.P. to mother alone, because she continued to reside with father, who had not. Father had not complied with his substance abuse treatment, his participation in random drug testing had been "sporadic," and he had failed to provide the social worker with proof of his attendance at NA/AA meetings or the name and contact information of his sponsor. Father had informed the social worker that he was going into inpatient substance abuse treatment for 30 days, but he apparently only stayed for three days. Mother's visitation had progressed to unsupervised visitations, but visits with father remained supervised. The social worker reported that mother had stated father was prepared to move out of the family home and stay with a friend, so that L.P. could be returned to mother. The social worker indicated that more time was needed to assess the situation, and promised additional information would be provided to the court at the 18-month hearing set for February 14, 2013.

On February 14, 2013, CFS filed additional information to the court, indicating that it was changing its recommendation to returning L.P to mother, on the condition that father move out of the home. CFS reported that it had received confirmation father had entered an inpatient substance abuse treatment program, would be in treatment for a minimum of 28 days, and father had indicated his willingness to move out and live with a friend when he was out of treatment, so that L.P. could be returned to mother while father completed his case plan. CFS asked for a continuance to verify that father had moved out.

At the 18-month review hearing on February 14, 2013, father's attorney confirmed that father had been discharged from his inpatient program, and had moved out of the family home. The court approved a plan to transition L.P. back to mother's custody, allowing L.P. to finish the school year he had begun while living with C.H., but to spend weekends unsupervised with mother at the family home. The court continued the matter until April 15, 2013.

On February 15, 2013, mother suddenly died; the cause of death was not known to CFS, according to the report of her death it filed with the juvenile court on February 21, 2013.

On April 10, 2013, CFS filed a status review report recommending that a section 366.26 hearing be set to establish a permanent plan of adoption for L.P., since it was no longer possible to implement the plan to return L.P. to mother. The report states that father terminated inpatient drug treatment after three days, rather than the expected 30 days, without informing CFS. The report describes father as having been in contact with

7

L.P. by phone daily, and visiting L.P. "when he can." However, while L.P. was grieving the loss of his mother, father did not attempt to increase his visitations with L.P.—to the contrary, father went to Florida to visit his own mother.

At the April 15, 2013, review hearing, father's counsel did not contest CFS's recommendation that reunification services be terminated and that father have continued supervised visitation. The court found there was not a substantial probability that L.P. would be returned to father within the statutory time frame, ordered continued supervised visitation by father, and set the matter for a section 366.26 hearing.

On August 8, 2013, CFS filed a "366.26 WIC Report," recommending that father's parental rights be terminated, and the permanent plan for L.P. to be adopted by C.H. be implemented. The report notes that L.P. "continues to receive excellent care" in C.H.'s home and that L.P. had expressed that he "wants to continue living [with C.H.] until I am an adult." The report states that father's in-person visits with L.P. had been "minimal," consisting of occasional visits supervised by C.H., and father had only brief phone calls with his son a few times weekly.

On September 3, 2013, father filed a section 388 petition asking that reunification services be reinstated, based on the changed circumstance that father had "completed substance abuse services through Loma Linda University Behavioral Medical Center." The CFS response to the petition notes, however, that father was uncooperative with CFS in verifying his aftercare and had submitted no evidence of drug testing to verify his sobriety or evidence of his participation at 12-step meetings. Moreover, the social worker reported that, according to C.H., father had not made any effort to see L.P., with

8

C.H. initiating and arranging any visits that occurred. Father's phone calls were, according to C.H., sporadic and lasted only a few minutes. Additionally, in July 2013, C.H. heard through a friend that father had remarried. C.H. called father to verify the information, and encouraged father to tell L.P. Father instead called L.P. and told him that he planned to remarry, but had not yet done so. According to C.H., L.P. felt betrayed that father had lied to him. When asked by the social worker, L.P. expressed a strong desire to live with C.H. and not with father. A report by L.P.'s therapist, submitted with the CFS response, expresses the opinion that C.H. was "doing an excellent job of providing a loving, stable home" for L.P, and L.P. had clearly expressed that he did not want to have any overnight visits with father. The therapist opined that adoption by C.H. "is clearly in [L.P.'s] best interests."

On October 7, 2013, the juvenile court heard argument on father's section 388 petition and also held the section 366.26 hearing. Father's counsel confirmed that the drug treatment program father completed had been outpatient, not inpatient. Father's counsel also conceded that father had not visited L.P. in person very often, though he argued that they do "talk on the phone several times a week on an almost daily basis," and that there had been "stretches of time" where they had spoken "several times a day." The juvenile court denied the section 388 petition, finding no changed circumstances sufficient to justify altering its previous order terminating reunification services. The court found father's visitation had not been regular, and had not been in person. The court acknowledged the "difficulties" in the father-son relationship noted by L.P.'s therapist, and found that L.P.'s relationship with father was "more in the nature of . . . a

9

concerned family member . . . there is definitely not a parenting role that the father is specifically assuming." The court therefore declined to apply the beneficial parental relationship exception to adoption, and ordered father's parental rights terminated.

### III. DISCUSSION

Father contends that the juvenile court erred by terminating his parental rights as to L.P. despite the existence of a beneficial parental relationship between father and L.P. He argues that the court should have instead ordered a guardianship with C.H., and ordered further reunification services with respect to father. We find substantial evidence supported the juvenile court's ruling, and therefore affirm.

At a section 366.26 hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the preferred permanent plan because it is more secure and permanent than legal guardianship or long-term foster care. (*Ibid.*) "Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child'" under one or more of the exceptions set forth in section 366.26, subdivision (c)(1)(B). (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*).) One such exception is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)

To establish the beneficial parental relationship exception to termination of parental rights, a parent has the burden of showing "both regular visitation and contact [with the child] and the benefit to the child in maintaining the parent-child relationship."

(*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81; see § 366.26, subd. (c)(1)(B)(i).) With respect to the "benefit to the child" prong of the exception, a beneficial relationship is one that "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.) The parent has the burden of demonstrating that "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed . . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The determination of whether termination of parental rights would be detrimental to the child is a "'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.]" (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

We review the juvenile court's finding as to the applicability of the beneficial parental relationship exception under the substantial evidence standard. (*Bailey J., supra*, 189 Cal.App.4th at p. 1314.) When the party with the burden of proof appeals, contending the trier of fact erred in concluding that party failed to meet his or her burden, the question on appeal "becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Accordingly, "a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.]" (*Bailey J.*, *supra*, at p. 1315.)

11

The record here does not compel a finding in favor of father as a matter of law. There is substantial evidence that father's visitation with L.P. was not regular, but rather became more sporadic over time, and especially after mother's death. Unlike mother, father never demonstrated to his social workers that anything other than supervised visitation would be appropriate, and when he did visit, he reportedly failed to interact and engage appropriately with L.P. After mother's death, father's in-person visitations with L.P. deteriorated to "minimal." Though father insisted that he had regular telephone contact with L.P., there was evidence to the contrary in the form of C.H.'s statements to the social worker, and L.P.'s statements to his therapist. Thus, substantial evidence supports the juvenile court's determination that father failed to establish the visitation prong of the beneficial parental relationship exception to termination of parental rights.

There is also substantial evidence in support of the juvenile court's determination that father had also failed to establish the benefit to the child prong of the exception. Father presented little evidence of a parental bond with L.P., conceding that he did not even visit L.P. in person very often; there also was evidence that what visits did occur were initiated by C.H., not father. After mother's death, father went to Florida to visit his mother, rather than attempting to increase contact with L.P., to help the child through his grief. Even accepting father's assertion that he remained in touch with L.P. regularly by phone, those telephone interactions between father and son were problematic, according to L.P.'s therapist, social worker, and caregiver. Thus, substantial evidence supports the juvenile court's finding that the relationship between L.P. and father was not so strong a

12

parent/child bond that it outweighs the benefits to L.P. that a stable, loving, permanent home with C.H. would provide.

We conclude substantial evidence supports the juvenile court's finding that father did not meet his burden of demonstrating the beneficial parental relationship exception should be applied.

## IV.  DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

Acting P. J.

We concur:

MCKINSTER

J.

KING

J.

13